UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 05-339 (JDB) |
| | : | |
| v. | : | |
| | : | |
| VICTOR BLASSINGAME | : | |
| | : | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, submits this memorandum in aid of sentencing. For the reasons set forth herein, the government respectfully recommends that the Court sentence the defendant to a period of incarceration at the high end of the Guidelines range calculated in the Presentence Report.

**I.   BACKGROUND**

On February 9, 2006, a jury found Victor Blassingame guilty of one Count of Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year in violation of 18 U.S.C. §922(g)(1). The evidence at trial established that on August 15, 2005, Officer Jeff Greene of the Metropolitan Police Department conducted a traffic stop on a white Ford Taurus station wagon being driven by the defendant. Soon after initiation of the traffic stop, Office Andrew Maybo of the United States Capital Police, who was backing up Ofc. Greene and standing on the passenger's side of the car, observed Mr. Blassingame reaching for a black revolver on the floorboard at the defendant's feet.[1] Fearing for the safety of both Ofc. Greene and himself, Ofc. Maybo yelled "gun" to alert Ofc. Greene, drew his service weapon, lunged through the open passenger's side

---

[1] At the time the defendant chose to reach for the handgun, the attention of Officer Greene – the officer closest to the defendant – was distracted as he was in the process of reviewing the defendant's license.

window, pointed his gun at the defendant's head, and told the defendant (in no uncertain terms) "don't fucking do it." In response, the defendant reared back from the gun, put his hands up and stated "don't shoot me."

The gun was recovered from the car and determined to be a Rossi .38 special revolver loaded with five live rounds of .38 caliber ammunition.

The government also proved at trial that the defendant was previously conviction of a felony punishable by a term of imprisonment of a year or more. The Presentence Investigation Report demonstrates that the qualifying conviction was for Murder II . According to the report, the defendant shot and killed Ronald Clark with a pistol on September 5, 1982.

## II.     SENTENCING CALCULATION

### A     Statutory Maximum

The maximum sentence for Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding one Year in violation of 18 U.S.C. §§922(g)(1), a Class C felony, is incarceration for a period not more than 10 years and/or a fine of $250,000, or both.

### B.     United States Sentencing Guidelines Calculation

Based on a total offense level of 14 and a criminal history category of II, the Guidelines range for the defendant is 18 to 24 months. Because the applicable Guidelines range is in Zone D of the Sentencing Table, the defendant is not eligible for probation. See USSG § 5B1.1, Comment n. 2, and USSG § 5C1.1(f). The PSR writer did not find factors indicating that a downward departure was warranted. See PSR at p. 13. For the reasons set forth, infra Section III of this Memorandum, the government respectfully recommends that the Court sentence the

defendant to a period of incarceration at the high-end of the Guidelines range of 18 to 24 months.

### C. The Impact of Booker

In <u>United States v. Booker</u>, 2005 WL 50108 (U.S. Jan. 12, 2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in <u>Blakely v. Washington</u>, 124 S. Ct. 2531 (2004). As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory, Title 18, United States Code, Section 3553(b)(1). <u>Booker</u>, 2005 WL 50108, at *16. However, the Court expressly refused to invalidate the Guidelines in their entirety. To the contrary, the Court upheld the remainder of the Guidelines as the most appropriate benchmark for informing courts as to the most reasonable sentence for a particular defendant who has committed a particular crime. Indeed, it remains the case that if the sentencing court imposes a sentence that is outside the range as set forth in the Guidelines, the Court must state in a written order of judgment and commitment the specific reason for the imposition of a sentence different from that described in the Guidelines. <u>See</u> 18 U.S.C. Section 3554(c)(2). The sentence will then be subject to review by courts of appeals for "reasonableness." <u>Id.</u> at *24.

In <u>Booker</u>'s wake, this Court must continue to resolve disputed questions of fact and law and correctly calculate a defendant's sentence under the existing Sentencing Guidelines. <u>See</u> Fed. R. Crim. P. 32(i)(3)(B) (court must rule on unresolved objections to the Presentence Report or determine that resolution not necessary to sentencing). "The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." <u>Booker</u> at *27 (citing 18 U.S.C. Sections 3553(a)(4)&(5) (Supp. 2004)). In light of this mandate – and the continued requirement of written explanations for sentences that fall

outside of the range called for by the Guidelines and the new standard of "reasonableness" review – it is plain that a sentence within the Guidelines, while not required, is reasonable <u>per</u> <u>se</u>. Not only is a sentence within the Guideline range reasonable <u>per se</u>, but it also accommodates the goal, endorsed by both Congress and the Supreme Court, of meting out fair and uniform sentences.

The Guidelines, aiming to achieve the uniform and appropriate treatment of like crimes, represent the distillation of two decades of careful study of sentencing practices across the country, and correlate as well to the varying severity of crimes as defined by Congress. The Guidelines, consisting of offense characteristics and various grounds for departure, address the considerations relevant to sentencing, as articulated in 18 U.S.C. Section 3553(a), such as "the nature and circumstances of the offense and the history and characteristics of the defendant"; "the need for the sentence imposed -- (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"; and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

Indeed, the Sentencing Commission formulated the Guidelines only after initially canvassing prior sentencing practice and attempting to identify and assign weights to all the factors – both aggravating and mitigating – that judges traditionally used in determining an appropriate sentence. See <u>United States Sentencing Comm'n, Supplementary Report on the</u>

Initial Guidelines and Policy Statements 16-17 (1987); see also 28 U.S.C. Section 994(m) (requiring Commission to "ascertain the average sentences imposed . . . prior to the creation of the Commission"); Comprehensive Crime Control Act of 1984, S. Rep. No. 98-225, at 168 (Commission should produce a "complete set of guidelines that covers in one manner or another all important variations that commonly may be expected in criminal cases").  Moreover, since the Guidelines were adopted, the Sentencing Commission has continued to study district court and appellate sentencing decisions and to "modify its Guidelines in light of what it learns." Booker, 2005 WL 50108, at *26; see id. at *27 (Sentencing Commission will continue "collecting information about actual district court sentencing decisions  . . . and revising the Guidelines accordingly").

It thus remains true that, absent unusual circumstances, the sentence in a criminal case should fall within the Guideline range as determined by this Court.  Each Supreme Court Justice in the various opinions in Booker recognized the express national policy goals, as articulated by Congress, that sentences be uniform across the country, to the extent possible, and that sentences be based on the offender's actual conduct and history.  See, e.g., id. at *21 (majority opinion of Breyer, J.) ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity."); id. at *19 (same) ("Congress' basic statutory goal -- a system that diminishes sentencing disparity -- depends for its success upon judicial efforts to determine, and to base punishment upon, the *real conduct* that underlies the crime of conviction."); id. at *42 (dissenting opinion of Stevens, J.) ("The elimination of sentencing disparity, which Congress determined was chiefly the result of a discretionary sentencing regime, was unquestionably Congress' principal aim."); id. at *47 (dissenting opinion of Scalia, J.) ("the

primary objective of the Act was to reduce sentencing disparity."). Since the Guidelines currently represent the only extant benchmark to encourage uniformity and thus the only tool to implement Congress' vision of sentencing uniformity and fairness, Guideline range sentences are currently the only mechanism available to implement Congress' basic statutory goals.

Booker, to be sure, departs from the prior practice of automatic reversal that would have accompanied the failure to sentence a defendant within the Guidelines. Such a sentence will now be reviewed instead for its "reasonableness." See Booker, at *24. Nevertheless, the Guidelines -- resulting as they do from years of study of sentencing practices, crime statistics, national crime policy, and consideration of the factors that inform sentencing, see 18 U.S.C. Section 3553(a) – provide the most concrete yardstick against which to measure what would be unreasonable. Booker not only prevents courts from substituting their individual judgment about the appropriateness of the Guidelines range without explaining with specificity their reasoning, Booker also continues to subject the explanation of the decision to sentence outside of the correctly calculated range to a court of appeals reasonableness review. See 18 U.S.C. Section 3553© (mandating consideration of the Guidelines); 18 U.S.C. Section 3553(c)(2) (mandating written explanations for imposing a sentence outside of the applicable Guideline range); 18 U.S.C. Section 3742(f)(1) (mandating court of appeals to set aside a sentence imposed as a result of an incorrect application of the Guidelines); 18 U.S.C. Section 3742(f)(2) (mandating court of appeals to set aside a sentence outside the Guidelines range when the district court fails to provide a required statement of reasons in the judgment and commitment order).

Fidelity to the Guidelines best accomplishes the purpose of fair and consistent sentencing and should occur absent unusual circumstances. This is so, said the court in United States v.

Wilson, 2005 WL 78552 (D. Utah Jan. 13, 2005) – the day after Booker was decided – because the Guidelines represent the product of an expert commission, that has studied the sentencing process at great length, under the specific mandate of Congress, to fashion recommended sentences that carry out the purposes defined by Congress.  The resulting Guidelines, Wilson held, plainly reflect the public's will, as expressed by their democratically elected representatives, in that Congress has repeatedly approved of the Guidelines or acted to adjust them to congressional preference.  Wilson further observed that guided sentencing appears to have had a positive impact in deterring criminal conduct throughout the country, and thus serves the purpose of deterrence as well as punishment and fairness.  For all of these reasons, Judge Cassell determined that "the court will give heavy weight to the Guidelines in determining an appropriate sentence.  In the exercise of its discretion, the court will only depart from those Guidelines in unusual cases for clearly identified and persuasive reasons."  Id. at *1.  A non-Guidelines sentence would, in the ordinary or usual case, unreasonably thwart legislative intent – in particular, the overriding concern with uniformity and the prevention of unfair disparities for similarly-situated defendants.

In this case, as explained further below, no unusual circumstances exist that warrant an exception to the preference for guideline sentencing.  Indeed, given the defendant's prior conviction for murder committed with a handgun, the defendant should be sentenced to a period of incarceration at the high end of the Guidelines range.

### III.   DEFENDANT SHOULD BE SENTENCED AT THE HIGH END OF THE GUIDELINES RANGE

The Government recommends that the Court sentence the defendant to a period of

incarceration at the high end of the Guidelines range of 18-24 months. Such a sentence would not only be presumptively reasonable, for the reasons outlined above, but would also be justified by consideration of the sentencing factors enumerated in 18 U.S.C. § 3553. Those factors fall into three main categories: the nature of the offense, the needs of the public, and the history and characteristics of the defendant. United States v. Ranum, 353 F. Supp.2d 984, 989 (E.D. Wis. 2005).

    The defense's assertions to the contrary notwithstanding, the offense of possessing a loaded handgun after having been convicted of a felony is very serious, and the defendant's conduct in particular represents a real and present danger to the community. Indeed, while any 922(g) conviction should be considered a serious offense given the extraordinary level of gun violence in the city, the defendant's conduct here was particularly reprehensible. The evidence at trial demonstrated that the defendant reached for a gun at his feet during a traffic stop while Officer Greene's attention was distracted. In doing so, the defendant demonstrated, at worst, deadly malice towards the officers and, at best, extreme indifference to the safety of those officers, Mr. Harvey Martin, himself, and other passers-by. Indeed, it was only because of Ofc. Maybo's quick thinking – and bravery – that the defendant's illegal possession of the handgun in this case did not lead to someone getting killed or seriously injured. Based on the record before the jury and now this Court, the defendant should not be heard to claim at sentencing that his wrongful conduct evidenced no danger or harm to anyone. The Court needs to send an unambiguous message to the defendant, and the community, that reaching for a handgun during a police traffic stop is extremely reckless and dangerous conduct that will not be tolerated.

    Apart from the seriousness of the present offense, the defendant also has a significant

criminal history that should be considered by the Court. In 1982, the defendant took a pistol – like he was seen reaching for in this case – and shot and killed another human being. His murder conviction should put to rest any question in the Court's mind concerning whether the defendant would have actually pulled the trigger in this case. The murder conviction demonstrates the true danger that the defendant poses to the community when armed with a gun as the jury found he was on August 15, 2005. Given the prior murder conviction, it would not be too much to expect that the defendant would stay away from handguns for the rest of his life. The defendant chose to violate that simple prohibition. And for that, he should be held accountable.

## IV.   CONCLUSION

The nature of the offense, the needs of the public and the defendant's criminal history all suggest a period of incarceration at the high end of the Guidelines range of 18-24 months would be appropriate. Such a sentence would reflect the seriousness of this offense, the community's need for protection from the dangers posed by the defendant's possession of a loaded gun, and the defendant's very serious criminal history.

Respectfully,

KENNETH L. WAINSTEIN
United States Attorney
Bar No. 451058

_____
G. Michael Harvey
Assistant United States Attorney
Narcotics Section, Mass.  Bar No. 447465
555 4th Street, N.W.  #4243
Washington, DC 20001
Phone: 305-2195; Fax: 514-6010

CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that I caused a copy of the foregoing to be served upon the attorney for the defendant, Rita Bosworth, Esquire, this 21th day of April, 2006.

_____
G. Michael Harvey
Assistant United States Attorney